No. 105,322

In the Matter of KIMBERLY J. IRELAND, *Respondent*.

(276 P.3d 762)

Opinion filed May 25, 2012.

*Stanton A. Hazlett*, Disciplinary Administrator, argued the cause and was on the brief for petitioner.

*Peggy A. Wilson*, of Morrow Willnauer Klosterman Church, LLC, of Kansas City, Missouri, argued the cause, and *James C. Morrow*, of the same firm, was with her on the brief for respondent, and *Kimberly J. Ireland*, respondent, argued the cause pro se.

*Per Curiam*: This is a contested original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Kimberly J. Ireland, an attorney admitted to the practice of law in Kansas in 2005.

On October 22, 2009, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed an answer on November 23, 2009. On September 9, 2010, a hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys where the respondent was personally present and was represented by counsel. The hearing panel determined that respondent violated KRPC 8.2(a) (2011 Kan. Ct. R. Annot. 615) (false statements concerning qualifications or integrity of judicial and legal officials). After the hearing's conclusion, the hearing panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"FINDINGS OF FACT

. . . .

"2. On March 19, 2007, the Respondent filed an action in divorce against Kevin Ireland, Johnson County District Court case number 07CV02121. Aaron McKee represented the Respondent until he was disqualified from the representation. Edward Bryne represented Mr. Ireland. The Honorable Allen Slater, Judge of the Johnson County District Court, presided over the Respondent's divorce.

"3. The divorce was bitterly contested and caused the Respondent to suffer physically and emotionally. The Respondent suffered heart trouble, was hospitalized on approximately six occasions, and had a pacemaker inserted. Additionally, the Respondent has been diagnosed with an acute stress disorderdepression and an adjustment disorder with mixed anxiety and depression.

"4. Judge Slater assigned Judge Kevin Moriarty to attempt to mediate the divorce. On September 26, 2007, Judge Moriarty held a mediation session in the Respondent's divorce.

"5. Shortly after 9:00 a.m., the mediation commenced. Initially, the parties, their attorneys, and Judge Moriarty met in his courtroom. After meeting and discussing general issues related to the divorce with both parties and attorneys, Judge Moriarty met separately with the Respondent and her counsel and Mr. Ireland and his attorney. Finally, the Judge met with the Respondent and Mr. Ireland without the presence of counsel. During this portion of the mediation, Judge Moriarty sat behind the bench.

"6. Subsequent to the mediation, on October 1, 2007, the Respondent sought the counsel of Judge Slater. The Respondent informed Judge Slater that Judge Moriarty used profanity and threats to intimidate and harass her during the mediation. Judge Slater advised the Respondent of her option to file a complaint with the Commission on Judicial Qualifications.

"7. On October 3, 2007, the Respondent filed a complaint against Judge Moriarty with the Commission on Judicial Qualifications concerning her issues with the mediation. In the complaint, the Respondent made the following allegations:

'On Wednesday, September 26, 2007, all parties in the above referenced case attended mediation with Judge Moriarty in Division 14, Johnson County District Court. Due to the highly adversarial nature of this case Judge Slater ordered the parties to mediation with Judge Moriarty; however, Judge Moriarty's behavior during the mediation was unacceptable and inexcusable and has caused the parties additional problems. Judge Moriarty tried to force me into resolving this case by using profanity, threats, intimidation and humiliation.

'Prior to separating the parties, Judge Moriarty began the mediation by proposing an "equal" distribution of the assets and debts while refusing to consider any factors, such as who incurred the debt, when the debt was incurred, income disparity, financial misconduct, etc. Shockingly, the "equal" distribution proposed by Judge Moriarty was worse than what my ex-husband had already agreed to in the pleadings. When I tried to explain that I could not afford his proposal he yelled that I was "wasting his fucking time."

'After finding a solution he believed was equitable, Judge Moriarty separated the parties to discuss maintenance. In March 2007, my ex-husband was ordered to pay $1,070 per month in maintenance. On or about June 6, 2007, a hearing was held and Judge Slater denied my ex-husband's motion

to modify maintenance and child support. He talked to my ex-husband and his attorney first. Upon his return, Judge Moriarty proposed $250 per month in maintenance claiming that I would be lucky to get that much from Judge Slater.

'More specifically, Judge Moriarty refused to listen to my side of the case. Although the case is more than six months old, and the respondent had never argued, orally or in writing, to impute income, Judge Moriarty unilaterally decided that I should be imputed with an annual income of $60,000. He further decided that my ex-husband's income was only $93,000 per year, even though prior to separating the parties Judge Moriarty was told by my ex-husband that he received a monthly bonus that he expects to total $5,000 annually. I pointed out that it was increasing my income so much was wrong [*sic*], but at the same time ignoring his bonus was unfair. Judge Moriarty responded by saying "it's what Judge Slater will order" and "he said he only got a $500 bonus last month." Judge Moriarty then used my ex-husband's $13,000 credit card bill to further justify the drastic reduction in maintenance. Judge Moriarty refused to listen when I pointed out that my ex-husband had admitted in the pleadings that the debt is solely his, that the card is solely in my ex-husband's name, I am not a responsible party and that I was not aware of the card until the divorce.

'Not only did Judge Moriarty ignore my position, but he never even gave me an opportunity to make a counter offer. When I said that I would only agree to resolve the entire case, including custody, Judge Moriarty told me that I was "sabotaging" the mediation and settlement process.

'Again, without any other offers to consider, Judge Moriarty immediately began discussing child custody. This time, however, Judge Moriarty had me return to the courtroom without my attorney. Judge Moriarty sat at the bench while my ex-husband and I sat at the tables. He made it crystal clear that his role was that of judge and not of mediator. He asked questions and demanded yes or no responses from me. When I tried to say I don't know or that I'd like to think about it, he accused me of being evasive or that I did not have my children's best interests in mind. He then proceeded to enter "**orders**" with respect to the children and marital property.

'Although Judge Moriarty's "orders" and refusal to listen to me were bad, his behavior was much worse. The majority of the time we were in the courtroom, it appeared as if Judge Moriarty was masturbating under the bench. He used profanity repeatedly, and continually used and directed the word "**fuck**" to me. He talked about my "panties," discussed my sex life and who I was "boinking." All of these things he did outside the presence of my attorney and in front of my ex-husband. I was extremely uncomfortable, and I felt trapped in a courtroom with a Judge who was intentionally intimidating and sexually harassing me.

'At one point when my ex-husband was complaining about a pair of bicycles, worth several thousand dollars, Judge Moriarty compared these two

bikes to my "panties". Although a protection of abuse order had been in place that I had to dismiss because the police would not enforce it, Judge Moriarty "ordered" that my ex-husband go to my house and take the bicycles in exchange for me getting to keep my "panties". I tried to argue that the bikes were marital property, not personal property and were extremely expensive, but he again said they were just like my "panties". He further said that Judge Slater would order that my ex-husband could pick up the bikes and that if I refused he would tell Judge Slater that I refused to cooperate.

'In addition, my ex-husband has made very false and very public allegations that I physically abused our children. Accordingly, a guardian ad litem was appointed. I have told my ex-husband on many occasions that unless and until he withdraws these false allegations and apologizes I will not deal with him directly. My ex-husband complained to Judge Moriarty that I refused to talk, text, and/or email with him. Instead of addressing these allegations, again without counsel and in front of my ex-husband, Judge Moriarty blamed me for causing problems with the children because I refuse to communicate with my ex-husband. He then "ordered" that I talk with my ex-husband at least every two days on the phone and, most shockingly, he "ordered" that my ex-husband and I take the children out to dinner like one big happy family.

'When the mediation finally concluded, I spoke to my attorney and explained what had occurred. When my attorney requested clarification, Judge Moriarty stated that he was going to send an email to Judge Slater and the parties claiming that I was uncooperative and unable to make decisions without my attorney.

'During the **voluntary** mediation process, I was intimidated, threatened and sexually harassed by a Johnson County District Court Judge. Judge Moriarty's behavior was more than unacceptable and unprofessional. The behavior of Judge Moriarty has impacted me both personally and professionally.'

The Respondent had no basis to allege that Judge Moriarty was masturbating during the mediation. Judge Moriarty's administrative assistant and his court reporter were in the courtroom during the mediation. Both women provided factual statements to the Commission on Judicial Qualifications refuting the Respondent's allegations.

"8.    On November 15, 2007, Judge Robert Fleming, Chairman of the Commission on Judicial Qualifications, sent a letter to the Respondent. Judge Fleming's letter provided:

'While Judge Moriarty was acting as a mediator in this situation, he is, at all times, a district court judge. With regard to Judge Moriarty using profanity during mediation, Judge Moriarty did admit to using profanity and advised he often repeats statements made by parties to confirm that he is

listening. He has been cautioned that such conduct is inappropriate for a judge, even when acting as a mediator.

'The Commission's investigation revealed, however, no support for the remaining conclusory allegations in your complaint. Given the serious nature of your allegations and the lack of support for them, the Commission determined to refer your complaint to the Disciplinary Administrator for investigation.'

"9.   On January 2, 2008, the Respondent filed a response to the complaint filed by Judge Fleming with the Disciplinary Administrator's Office. In her response, the Respondent stated:

'As an initial matter, the complaint filed by Mr. Fleming is improper and retaliatory and should be dismissed because truth is an absolute defense and complainants are absolutely immune from prosecution. Subject to and without waiving, I offer the following response.

'As I [sic] licensed Kansas attorney, I have certain rights, responsibilities and obligations. I have always done my best to uphold the laws, rules and regulations of this state. I have also always made a conscious effort to perform my duties in an ethical manner. Unfortunately, others do not always share my perspective, and it is these very people that have now required me to respond. I can assure the judicial committee, Judge Moriarty and you that I do not intend on taking this retaliation lying down.

'My complaint against Judge Moriarty stems from a mediation he conducted in my divorce case. During the mediation Judge Moriarty used profanity and threats to intimidate and harass me. He attempted to enter orders in my divorce matter even though he was only serving as the mediator and he was not the judge assigned to the divorce. Now, after being assured that I would not be retaliated against, a bar complaint has been filed against me and I am being forced to defend myself for filing a complaint. If, however, I would have simply walked away and allowed Judge Moriarty to continue his behavior I would have neglected my duties as a Kansas attorney and violated my ethical obligations to the citizens of this state.

'You have already received and reviewed the complaint that I filed against Judge Moriarty, and I continue to stand by each and every allegation. However, I only filed my complaint at the request of Judge [Allen] Slater. My decision to file a complaint against Judge Moriarty was not easy. Because I was fearful of retaliation I discussed the situation with Judge Slater. Not once did he say it was unbelievable; to the contrary, he was visibly shaken, he apologized profusely for assigning Judge Moriarty to conduct the mediation and, most importantly, he walked me through the procedure for filing a complaint against Judge Moriarty. Judge Slater, using his own rule books in his office, looked up and directed me to the pertinent statutes and gave me as much information as he could for filing a complaint.

'Based upon Judge Slater's request and KRPC 8.3(b) I had no choice but to file a complaint against Judge Moriarty. After I filed the complaint, Ms.

Carol Green assured me on several occasions that no retaliation would be taken against me for filing. In addition, a careful review of the laws of the State of Kansas makes it quite clear that I am absolutely immune from any action for filing a complaint.

. . . .

'. . . During my discussion with Judge Slater, he made a comment that epitomizes the purpose of immunity in this situation, Judge Slater specifically said "my daughter is an attorney and I would hate to see her treated this way." '

"10.  Despite the Respondent's statement above that she filed the complaint with the Commission on Judicial Qualifications after speaking with Judge Slater, she failed to acknowledge that she never mentioned to Judge Slater that Judge Moriarty 'appeared to be masturbating' during the mediation.

"11.  On September 25, 2009, the Respondent filed a Complaint in the United States District Court for the District of Kansas, *Ireland v. Moriarty and the Johnson County, Kansas, Board of Commissioners*, case number 09-CV-2506 JWL/JPO. In the Complaint, the Respondent made the following allegations:

'13.  On September 26, 2007, the plaintiff Ireland attended voluntary mediation conducted by defendant Moriarty.

'14.  Defendant Moriarty used profanity during the mediation. . . .

'15.  Defendant Moriarty used the word "fuck" during the mediation.

. . .

'16.  Defendant Moriarty discussed plaintiff Ireland's female undergarments and referred to the same as "panties" during the mediation. . . .

'17.  Defendant Moriarty discussed plaintiff Ireland's sex life during the mediation. . . .

'18.  Plaintiff Ireland's sex life was irrelevant to the divorce matter. . . .

'19.  Defendant Moriarty appeared to be masturbating during the mediation. . . .

'20.  Plaintiff Ireland's ex-husband testified during the trial of the divorce that defendant Moriarty's behavior during the mediation may have been offensive to others.

'21.  Most, if not all, of defendant Moriarty's inappropriate behavior during the mediation occurred while only defendant Moriarty, plaintiff Ireland and Kevin Ireland were in the room. . . .

'22.  On October 1, 2007, plaintiff Ireland complained about defendant Moriarty's behavior to District Court Judge Allen Slater.'

"12.  The allegations made by the Respondent have been reported in the Kansas City area in the *Pitch Weekly*.

"13.  On December 15, 2009, the Respondent voluntarily dismissed her federal court action against Judge Moriarty and Johnson County Kansas Board of Commissioners and issued a press release that provided:

'On Tuesday, December 15, 2009, Kimberly J. Ireland dismissed her federal court action and publicly apologized to Johnson County Judge Kevin

Moriarty, his family and other Johnson County District Court personnel for alleging wrongful conduct that she mistakenly believed took place in the midst of her highly contentious divorce action. The divorce action, still pending after two years, has caused Ms. Ireland to suffer heart ailments and extreme anxiety. After further reflection, Ms. Ireland believes her perceptions regarding Judge Moriarty's conduct and the conduct of other court personnel involved in her divorce action were the product of extreme stress, and she has now determined that her claims were untrue.

'Ms. Ireland regrets the ridicule, embarrassment and harm her allegations caused to Judge Moriarty, his family, and other Johnson County District Court personnel.'

"14. On March 1, 2010, the Respondent agreed to a temporary suspension of her law license. Thereafter, on March 31, 2010, the Kansas Supreme Court issued an order temporarily suspending the Respondent from the practice of law. As a result of the Respondent's temporary suspension, she left the firm she formed with Aaron McKee.

## "CONCLUSIONS OF LAW

"1. Based upon the Respondent's stipulation and the above findings of fact, the Hearing Panel concludes as a matter of law that the Respondent violated KRPC 8.2(a).

"2. KRPC 8.2(a) provides:

'A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office.'

The Respondent violated KRPC 8.2(a) when she repeatedly asserted that Judge Moriarty 'appeared to be masturbating' when she had no basis for making the statement. Additionally, the Respondent violated KRPC 8.2(a) when she asserted in the federal lawsuit that Judge Moriarty used his authority as a district court judge to request that his administrative assistant and court reporter falsely state in letters to the Commission on Judicial Qualification that he had done nothing wrong. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 8.2(a).

## "AMERICAN BAR ASSOCIATION
## STANDARDS FOR IMPOSING LAWYER SANCTIONS

"In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"*Duty Violated.* The Respondent violated her duty to the public, the legal system, and the legal profession to maintain her personal integrity.

"*Mental State.* The Respondent knowingly violated her duty.

"*Injury.* As a result of the Respondent's misconduct, the Respondent caused actual, serious, injury to Judge Moriarty and to the legal profession.

"*Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

"*Dishonest or Selfish Motive.* The Respondent's misconduct involved making false allegations against Judge Moriarty.

"*A Pattern of Misconduct.* The Respondent engaged in a pattern of misconduct by making serious false allegations against Judge Moriarty in three separate forums over a period of 2 yearsthe letter of complaint to the Commission of Judicial Qualifications, the response to the disciplinary complaint, and the Complaint in the federal law suit.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

"*Absence of a Prior Disciplinary Record.* The Respondent has not previously been disciplined.

"*Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct.* The Respondents conduct occurred while she was amidst her extreme stressful, highly contentious divorce action, which caused her extreme anxiety and physical heart ailments requiring hospitalizations. The Respondent has sought and continues psychological counseling and treatment from Dr. James Ryabik.

"*Inexperience in the Practice of Law.* At the time the misconduct began, the Respondent was inexperienced in the practice of law.

"*Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney.* According to letters received by the Hearing Panel, the Respondent was an active and productive member of the bar in Johnson County, Kansas, and enjoyed a good reputation.

"*Imposition of Other Penalties or Sanctions.* Since March 1, 2010, the Respondent has been temporarily suspended from the practice of law as a result of the instant complaint. For a period of time following the suspension, the Respondent was able to find employment. However, she lost that job after an article was published in the *Pitch Weekly* regarding the Respondent's allegations against Judge Moriarty.

"*Remorse.* The Respondent expressed remorse at the hearing. However, when given the opportunity to testify regarding what she regrets about this matter, she discussed the impact on herself and her professional status. Only after prompting

by counsel did the Respondent address the effects of her conduct on her children, Judge Moriarty, and his family. It appears that the Respondent's only apology to Judge Moriarty came in the form of a press release written by her attorney. To call a press release an apology is disingenuous. The Hearing Panel concludes that, to date, the Respondent has only a limited recognition of the impact of her actions.

"In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standards:

'7.2 Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

## "RECOMMENDATION

"The Disciplinary Administrator recommended that the Respondent be indefinitely suspended from the practice of law. Counsel for the Respondent recommended that the Respondent be censured by the Kansas Supreme Court and that the censure be published in the Kansas Reports. Counsel for the Respondent further recommends that the temporary suspension be lifted.

"The Hearing Panel is concerned that, to date, the Respondent does not have a clear understanding of her wrongdoing. The Respondent's failure to truly understand the misconduct was highlighted by the following exchange during the hearing on the Formal Complaint, when the Respondent was questioned by the Presiding Officer:

'Q. I guess what I'm most curious about is what you would do differently today if confronted with a situation like the one that you believed you found yourself in, in 2007 at the mediation?

'A. It's difficult to say because I would like to say that I would not file a complaint at all and that would be a very easy answer. But thesome of the behavior that occurred, like the profanity, I believe was something that was inappropriate. But in hindsight with all of the trouble that it's caused I don't know that I would file another judicial complaint.

'Q. But you make that response based upon the consequences of what you did three years ago or because you now believe that what you did was wrong?

'A. I believe my word choice in my complaint was wrong. That and I would never do that again and I would never advise anyone to do that ever. And I do believe that it affected the integrity of Judge Moriarty and I would never do that again. I do believe that it was wrong.

'Q. You've talked about several events in this case, most of which occurred during the mediation but some afterwards as well, including the judicial counsel's disposition of the matter as being something that you felt affected or impugned your side of the story or your personal integrity. Do I understand correctly that that's how it made you feel?

'A.    It made me feel that way at the time and it may have just been that I did not understand the judicial commission's role that they were to play in thatthat I did not understand what their role was.

'Q.    What do you understand differently today?

'A.    That they may not be there to investigate every judicial complaint that comes in and that they may not call and talkspeak to everybody. That they may not come down and investigate and talk to and ask for letters and do a full what I think of as an investigation. And that I should have taken it upon myself to gather letters, such as Judge Moriarty did, and to complete my story so that they had the full story in front of them.'

"Based upon the findings of fact, conclusions of law, and the Standards listed above, the Hearing Panel unanimously recommends that the Respondent be suspended from the practice of law for an indefinite period of time. The Hearing Panel further recommends that the indefinite suspension be made retroactive to the date of the temporary suspension.

"Costs are assessed against the Respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## RESPONDENT'S EXCEPTIONS

On December 27, 2010, the respondent filed exceptions to the final hearing report. See Supreme Court Rule 212(e) (2011 Kan. Ct. R. Annot. 352). Specifically, she took exception to the hearing panel's conclusion concerning her violation of KRPC 8.2(a) (2011 Kan. Ct. R. Annot. 615) (judicial and legal officials). She also took exception to the hearing panel's findings of facts 2, 7, 8, and 10. Finally, with regard to the subject of the appropriate discipline, the respondent took exception to the hearing panel's recommendation of discipline and costs.

The respondent did not argue all of these exceptions in her brief, however. She instead raises only one issue for this court's consideration: whether indefinite suspension for a violation of KRPC 8.2(a) is too severe a sanction in this matter. Because she did not argue the other exceptions that she had raised, the respondent has abandoned those exceptions. See *In re Johanning*, 292 Kan. 477, 486, 254 P.3d 545 (2011) (a respondent who does not advance arguments in a brief to this court that support exceptions to the final hearing report is deemed to have abandoned the exceptions).

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence,

the findings of the hearing panel, and the arguments of the parties and determines whether violations of the KRPC exist, and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009); see Supreme Court Rule 211(f) (2011 Kan. Ct. R. Annot. 334). Clear and convincing evidence is " 'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable." ' " *In re Lober*, 288 Kan. at 505 (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

This court considers the hearing panel's findings of fact, conclusions of law, and recommendations to be advisory but gives the final hearing report the same dignity as a special verdict by a jury or the findings of a trial court. *In re Frahm*, 291 Kan. 520, 525, 241 P.3d 1010 (2010).

With respect to the discipline to be imposed, the hearing panel's recommendation that the respondent be suspended from the practice of law for an indefinite period of time and that the indefinite suspension be made retroactive to the date of the temporary suspension is "advisory only and shall not prevent the Court from imposing sanctions greater or lesser than those recommended by the panel or the Disciplinary Administrator." Supreme Court Rule 212(f) (2011 Kan. Ct. R. Annot. 353); see *In re Depew*, 290 Kan. 1057, 1073, 237 P.3d 24 (2010). The disciplinary sanction must be based on the specific facts and circumstances of the violations and the aggravating and mitigating circumstances presented in the case. *Johanning*, 292 Kan. at 490.

The respondent requests that this court find indefinite suspension too harsh and recommends instead that her self-imposed 1-year suspension be deemed sufficient discipline and that any additional discipline be limited to published censure. Reprimand or censure is generally appropriate when a lawyer engages in negligent conduct that causes injury or potential injury. *In re Swanson*, 288 Kan. 185, 215, 200 P.3d 1205 (2009); ABA Standards 4.43, 4.63, 7.3.

KRPC 8.2(a) reads:

"A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office." (2011 Kan. Ct. R. Annot. 615).

The stipulated facts demonstrate a knowing violation of the respondent's professional duties. Granting that she was in great emotional distress during her divorce and the related physical suffering, writing letters and filing federal lawsuits surely are intentional, not negligent, acts. The respondent suggests that her behavior was "reckless" but that she did not intend to cause harm to Judge Moriarty or the legal system. It is not credible, however, to maintain that an attorney could file a disciplinary complaint and a civil law suit against an individual without understanding that those actions would cause harm to the individual.

The respondent submits that prior cases support imposition of a lighter sanction. Each disciplinary sanction is based on the specific facts and circumstances of the violations and the aggravating and mitigating circumstances presented in the case. Because each case is unique, past sanctions provide little guidance. *In re Bishop*, 285 Kan. 1097, 1108, 179 P.3d 1096 (2008). When an attorney's misconduct is clearly intentional, some length of suspension from the practice of law is the appropriate sanction. *Swanson*, 288 Kan. at 215; *Bishop*, 285 Kan. at 1109.

As mitigating factors, the respondent emphasized her precarious emotional and physical health during the pendency of her divorce, her lack of other ethical misconduct, her relative professional inexperience, her retraction of the accusations and her apology to Judge Moriarty, and her self-imposed suspension and cooperation with the Disciplinary Administrator.

We note, however, that the respondent's professional misconduct was not limited to a single instance but consisted of repeatedly making false accusations against a judge. These allegations became a matter of public concern when they were set out in a lawsuit and were discussed in the media. The respondent subsequently acknowledged that most of her accusations were false, yet she con-

tinued to suggest that the real problem was her failure to document her accusations adequately. While we recognize that certain factors operate to mitigate the intentional nature of the misconduct, we deem the misconduct to have been of sufficient magnitude to warrant suspension.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Kimberly J. Ireland be suspended from the practice of law in the state of Kansas for a period of 2 years and that the suspension be retroactive to the initial date of the respondent's temporary suspension, March 31, 2010.

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 219 (2011 Kan. Ct. R. Annot. 380) in the event respondent seeks reinstatement.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.